[Crim. No. 2953. Third Dist. Nov. 4, 1959.]

THE PEOPLE, Respondent v. WILLIAM EARL HUBBARD, Appellant.

Jensen & Underwood for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

PEEK, J.—Defendant was convicted of a violation of section 702 of the Welfare and Institutions Code following a jury trial. His motion for a new trial was denied and he now appeals from that order and from the judgment.

On appeal defendant contends (1) that the court erred in admitting evidence of alleged prior misconduct; (2) that the court erred in giving an instruction on the element of intent; (3) that the court abused its discretion in refusing his proffered evidence concerning his reputation for morality; and (4) that the court abused its discretion in not allowing him to introduce evidence concerning the reputation for truthfulness of a prosecuting witness.

Since it is our conclusion that the court erred as set forth in defendant's first contention (which is likewise applicable to his second contention) it is necessary to examine the entire record to determine if such error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.) We therefore have summarized the evidence in detail.

The prosecution's case consisted of testimony by the prosecutrix, by a detective sergeant of the Stanislaus County Sheriff's office, by the chief investigator for the district attorney's office, and by a 15-year-old cousin of the prosecutrix.

The prosecutrix, a child of 10 years, was the first witness. She testified that she had gone to the graduation ceremony of the summer Bible school class at the church where defendant was the minister. She had walked unattended to the ceremony from her home which was approximately a half block distant from the church. Her mother had told her to ask one of the teachers to bring her home. At the conclusion of the exercises the teachers left, and the defendant stated to her that he would take her. Although she stated that her mother had suggested she ask one of the teachers to take her home, she told the defendant she was going to an aunt's home instead. As they were driving toward the aunt's home, the defendant

stopped for a stop sign, at which time he placed his hand on her leg and said, "I pinched it, didn't I?" On the way they passed the school ground where a "donkey" baseball game was in progress. They were at the opposite side of the field from the main gate and defendant told her to wait a minute and he would take her around to the main gate. As he started up he pulled her over close to him, and because she was afraid he might hurt her, she made no remonstrance. When he pulled her toward him he pressed her hard on the chest, and shortly thereafter he placed his hand under her dress and panties and ". . . asked me to stretch my legs and said did it tickle." She was not sure if his hand was inside or outside of her panties, but she was of the impression that it was inside, and in response to the question, "Did he just lay his hand on you or did he press on you or do you know?" she answered, "He moved it around." Later when she was asked if defendant had placed his hand upon her "private parts" she answered in the affirmative, saying that while he was doing this he had said, "Spread your legs," and "Does it tickle?" She then testified that immediately thereafter he stopped the car and let her out; that she saw her aunt and went home with her. Upon reaching her aunt's home she spoke to her 15-year-old cousin and recounted the events previously referred to.

Upon cross-examination she testified that her home was approximately a half block from the church but that she was going to her aunt's home which was approximately two or three blocks away. She did not remember whether the defendant had suggested that possibly she should not go to the ball game in response to her request that she wished him to let her out there. However, she said she wanted to go to the game, that she had not asked her mother if she could go but later stated her mother had told her she couldn't go to the game. Then she stated that the reason she went to the game was that she became frightened when defendant pinched her leg. Although she stated she was afraid of the defendant, she also testified that he made no attempt to restrain her from getting out of the car; that when he pulled her over to him his hand was on her side; that she did not remember what he did with his hand after that, but she did state that previously he had started to ". . . pull up my dresses [sic] and got into my underwear." She rode home with her aunt but told her nothing about what had occurred. The first person she said anything to was her cousin, Ginger Yvonne Rogers, who was

approximately 15 years of age. She testified that she there-after told her mother and her brother and talked to a member of the police. She further testified that she had discussed the matter with a schoolmate who had had a similar experience, and that she had also discussed the case with other school children. In her testimony she estimated that the time it took to go from the church to the ball game was approximately three or four minutes, that at the time defendant pulled her toward him she remembered him saying, "It is kind of chilly." In that connection she testified that she said nothing in reply because she was "... too scared to say anything."

The next witness called by the prosecution was Edward Bates, a detective sergeant of the Stanislaus County sheriff's office, who testified that he first talked to the defendant in front of his home on the day following the alleged offense; that when defendant was told who the complainant was, he said: "Why, bless her heart, she must be mistaken." At the officer's request the defendant met him at the sheriff's office the following afternoon. At their subsequent conversation the officer informed defendant of his right to counsel, that he did not have to talk if he did not wish to, and defendant stated he would be willing to do so. The officer testified he asked the defendant if he had placed his hand on the child's private parts and his reply was, " 'The only place I touched her was on the shoulder. I patted her on the shoulder. Well,' I said, 'that isn't what she said. She said you went further than that. She said that you touched her on her private parts, and in fact you asked her, "Does that tickle?" ' And he said in response to that, he says, 'Well, I might have tickled her on the ribs, on one side, just playfully, but that's all, no further than that.' However, he then went on to say, 'Well, I'll tell you, I'll tell you the truth,' he said, 'I dropped my hand down to her private parts,' and he said, 'I was struck with shame,' he said, 'I squeezed'—he said, not squeezed, 'I pressed,' he said, 'I pressed down there,' and his hand went three times, like this (illustrating.)" Thereafter the officer called Ferguson Buster, the chief investigator for the district attorney's office, and in the presence of the defendant, related what the defendant had said. The defendant did not deny the statement.

The prosecution then called Mr. Buster who testified that he made a recording of the statement of defendant which was thereafter introduced into evidence. According to Buster,

the defendant denied that he had molested the child in any way.

The next witness called by the prosecution was the cousin, Ginger Yvonne Rogers, who testified that when the girl returned home she immediately began to cry and said that the defendant had ". . . fingered around between her legs." The witness denied that she had told one of the defendant's daughters that the prosecutrix had not shed a tear at the time of her conversation with her. When she was asked if she knew what the reputation of the prosecutrix was for truthfulness and veracity in the community, she replied that she did, and that "Sometimes she tells little stories, but not too big ones." The court struck the answer upon the ground it was not responsive. The question was again asked and the same reply was given, whereupon the court explained the purpose of the question and noted that it was ". . . what other people think of her as to whether or not she is truthful or untruthful. That is the question. Now, do you think you can answer it? A. Yes. Well, I would say she is truthful. The Court: Well, that still doesn't answer it. The question is what other people think; what her reputation is. You know what the word 'reputation' is? A. Yes, I don't think I could answer that." This concluded the plaintiff's case.

At the trial the defendant, testifying in his own behalf, stated that while they were proceeding to the game, he noticed that the prosecutrix moved forward in the seat, away from the door, and he asked if she were cold, to which she replied she was. He told her to "scoot" over a little. As she started to do so he reached over and put his hand on her side near her ribs and pulled her toward him. He then relaxed his hand down on her lap. He stated he left his hand there just in an act of consolation and kindness toward the child. Just before they got to the gate he pulled her toward him and "kind of pressed her tummy." He noticed his hand in her lap and withdrew it because he felt it wasn't in a correct position, and in doing so tickled her in the ribs saying, "Are you ticklish" or something like that in a "kittenish" way. He then stopped the car for her to get out and drove back to the church. He estimated the entire trip took approximately five minutes. He also testified, as set forth in his statement, that he felt ashamed after he pulled the child toward him and found his hand in an improper position, and that he felt that he should have apologized to her. Upon his return to the church he

rearranged some of the furniture, counted the collection money and went home with his family.

Both on direct and on cross-examination it was defendant's contention that he had no intent nor thought of doing anything wrong. Specifically, on cross-examination, he testified in part, "I just relaxed my hand down on her lap, there. I suppose you would say more accidently [sic], yet I was just showing kindness to the child." He also testified that he pressed the child's "tummy" just before he let her out as an act of consolation. He defined this term as a thought or an impulse to be kind, saying that there are good and bad temptations, and that his acts were the result of good temptation. He was then asked if he customarily performed these acts on female persons by placing his hand in their laps. He answered that he did not, and stated that this was the only time he had ever done so. He was then asked if he had ever placed his hands on any other female person and performed this act of consolation. In answer to an objection by defense counsel, the prosecuting attorney stated to the court that defendant had put in issue the question of intent and therefore the question was proper. The matter was then discussed in chambers. During the discussion counsel for defendant stated that he questioned whether other acts against other persons, not children, could be shown. The contention of the district attorney was that the evidence was admissible on two grounds—first as tending to prove intent, and second as a basis for impeachment. The trial judge ruled that the prosecution could lay the necessary foundation for impeachment by asking defendant if he ever committed similar acts of consolation, and that he would not limit such interrogation to acts against children. Upon the reconvening of the court, the district attorney asked the defendant, "Have you ever placed your hands on any other female person and performed this act of consolation?" Defendant's answer was "no." Later defendant was asked if he placed his hands on women against their will or even with their consent. He answered in the negative before an objection was made. However, the court sustained the objection.

In rebuttal the prosecution, over the vigorous objection of the defense, was allowed to call three adult women who testified that the defendant, while visiting in their homes, had placed his arms around them, and one who testified that the defendant attempted to kiss her. The action of the court in

admitting such testimony forms the basis for defendant's first contention.

Thereafter the defense called certain witnesses to testify concerning the reputation of the prosecutrix for truth and veracity in her community. The first witness called was the pastor of the Brethren Church in Waterford who testified that her general reputation was questionable and not dependable, and that he would be inclined to seriously question her testimony. He based his conclusions upon discussions had with various people in the community, including her teacher, the superintendent of schools and the postmaster. A second witness testified that she had lived in the community for 14 years and that the prosecutrix had a reputation for being untruthful. Upon cross-examination she stated her opinion was predicated upon the fact that the child had lived with her for some time, and that her reputation had been the same since she was very small. The third witness was the minister of the Community Baptist Church in Waterford who testified that the child's reputation for truth, honesty and integrity was very poor, and that he would have reason to doubt her testimony. The fourth witness, a Sunday School teacher at the church of which defendant was pastor, testified that the child was untruthful and that she based her opinion upon the feeling among the people with whom she associated at the church. The next witness, a long-time resident of the community, testified that he had known the child for many years and that her reputation was bad; that he was not a member of the defendant's church but was a member of the Calvary Baptist Church in Waterford. Another witness testified that contrary to the testimony of the prosecutrix, she heard the child request the defendant to drive her home. The district superintendent of the Waterford elementary schools was also called by the defendant. His first statement was that she was not too reliable. Following an objection to the answer, and after an extensive discussion among the court, the parties and the witness, the latter stated, ''I would say that it leans towards the bad side, so if there is no degree in between, I would have to say bad,'' and also that he would not believe her under oath. He predicated his determination of her reputation upon his acquaintanceship with her during the time she had attended school. Robert Gannon, whose wife was a cousin of the prosecutrix, testified in contradiction of the testimony of the prosecutrix, that he first saw her early

in the evening at the "donkey" baseball game when she asked him what time it was. When informed that it was 8 o'clock, she stated she would have to go and hurriedly left the park. He next saw her after the game when she came up to his car and asked if he would take her home. At that time she was not crying. She did not seem upset nor did she mention any incident with the defendant. He also testified that her reputation was not good, and in response to a question as to whether he would believe her under oath, he answered, "No, sir, I wouldn't." His wife, Shirley Gannon, testified that she was at the ball game; that the prosecutrix spoke to her; that she did not seem upset, her clothes were not rumpled, and she was not crying and said nothing concerning any incident with the defendant. Also testifying in behalf of the defendant was his daughter who testified that she was a classmate of Ginger, the cousin to whom the prosecutrix first spoke concerning the occurrence of that evening. According to the defendant's daughter, Ginger told her, "I know Gwenda [the prosecutrix] didn't shed a tear, and she said, I don't believe about your Dad, anyway, but my folks do. I wouldn't believe Gwenda, because she has told lies on a lot of other people." Defendant's wife, testifying in his behalf, stated that she was at the church on the evening in question; that she did not realize her husband was away because it was such a short interval of time, and that he was neither upset nor nervous when he returned.

██ The general rule is that evidence of the commission of other offenses by a defendant is not admissible, the reason being that its probative value is far outweighed by its prejudicial effect. (*People* v. *Westek*, 31 Cal.2d 469 [190 P.2d 9]; 22 C.J.S., Criminal Law, § 682, p. 1084; 8 Cal.Jur., Criminal Law, § 167, p. 58; Wigmore on Evidence (3d ed.) vol. 1, § 193, p. 642; § 194, p. 646.) Or, as the court stated in *People* v. *Asavis*, 22 Cal.App.2d 492, 496 [71 P.2d 307], it is the result of recognition of the fact that prejudice to the defendant may, and usually does, follow from evidence that at some time in the past he has committed some other crime. ██ However, there is an exception to this rule. Where, as here, the defendant acknowledges the commission of a particular act on his part but asserts his innocent intent, he thereby places that element in issue, and the prosecution may introduce evidence tending to show that he has committed the same or a similar offense. (*People* v. *Westek, supra.*)

█ Here the essence of defendant's position throughout the trial was that any act he may have committed was not done with any intent to cause or tend to cause the prosecutrix, a person under the age of 21 years, to lead an "idle, dissolute, lewd, and immoral life" as charged in the information.

The questions asked by the prosecution and the testimony given by the four adult women were in no way responsive to this issue. Certainly the conduct of a man in placing his arm about a mature woman or attempting to kiss her cannot be considered as the same or similar to the act of fondling a minor child. The evidence so admitted related to wholly dissimilar acts, and hence should not have been admitted as evidence calculated to rebut the innocent intent claimed by the defendant. (*People* v. *Westek, supra.*) And since the women's testimony related to collateral matters, it was likewise inadmissible for the purpose of impeachment.

Applying the rules enunciated in the cited cases, it follows that the court erred when it allowed the prosecution to interrogate defendant concerning acts with "any other female person" and to introduce testimony that defendant had placed his arms around three adult women and attempted to kiss a fourth. Such error was magnified when the court instructed the jury that such acts were similar to those with which defendant was charged; that such evidence could be considered in relation to defendant's state of mind as to knowledge and intent and as bearing on the truth of any statement of defendant inconsistent with the nature of the evidence as to the other acts.

Since the judgment must be reversed for the reasons heretofore set forth, it becomes unnecessary to discuss the further contentions made by the defendant.

The judgment and order are reversed.

Van Dyke, P. J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 30, 1959.